**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William J. KELLEY, Defendant–Appellant.**

**No. 88–1231.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1988.

Decided Jan. 10, 1989.

Douglas G. Wagner, Pollen, Brazill & Bennett, Indianapolis, Ind., for defendant-appellant.

Susan E. Heckard, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before POSNER, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendant–Appellant William Kelley was convicted by a jury in the Southern District of Indiana on one count of willfully filing a false individual income tax return, in viola-

tion of 26 U.S.C. § 7206(1), and eight counts of willfully assisting others in filing false income tax returns, in violation of 26 U.S.C. § 7206(2). Kelley appeals from the judgment of conviction asserting that: (1) the district court erred in refusing to give a tendered instruction on good faith reliance on advice of counsel; (2) the district court erred in admitting into evidence certain statements pursuant to Federal Rule of Evidence 801(d)(2)(E); (3) the district court erred in failing to dismiss the eight counts under § 7206(2) as barred by the statute of limitations; (4) there was insufficient evidence to support the convictions; (5) the district court erred in admitting an exhibit into evidence; and (6) the district court erred in refusing to give a tendered instruction on first amendment protection of advocacy. For the reasons stated in this opinion, we affirm the judgment of conviction.

I.

This case concerns a tax shelter investment known as Stephen Mandarano Fine Arts, Ltd. ("SMFA"). Stephen Mandarano owned both SMFA, a New Jersey corporation, and a New Jersey art publishing company called Graphic House. The tax shelter worked as follows. Investors bought original lithographic plates from SMFA, along with the rights to the lithograph prints made from the plates and the photo reproductions of the prints (collectively, "artwork"). Investors paid between $12,500 and $18,500 in cash and signed a promissory note for the balance of between $155,000 and $238,000. According to the SMFA offering memorandum, the promissory notes were part recourse and part non-recourse—*i.e.*, the investor was personally liable for the recourse portion of the note (approximately one-third of the total note amount), while the non-recourse portion was secured only by the sale of the artwork. The investors assigned distribution rights to the artwork to Graphic House. As Graphic House sold the artwork, 50% of the receipts were applied to the recourse portion of the notes; the other 50% was retained by Graphic House. According to the offering memorandum, in-

vestors could claim depreciation deductions against the cash payment and the recourse portions of the notes each year for seven years following the initial investment.

The problem with the tax shelter involved the recourse portion of the notes. Prior to 1979, the Internal Revenue Code allowed an investor to base her depreciation deductions on financing which was non-recourse. Beginning in 1979, the Code included an "at risk" limitation, which provided that an investor was only entitled to depreciation deductions for the recourse portion of her financing—*i.e.*, for the portion which she was personally liable to repay. *See* 26 U.S.C. § 465. The tax shelter, as described above, would have met the at risk requirement and would have allowed investors to claim deductions against the recourse portions of the notes. However, as an inducement to investors who might be reluctant to enter into a contract that exposed them to personal liability, SMFA provided each investor with a "side letter agreement" that, in effect, negated personal liability on the recourse portion of the notes. The letter assured the investor that SMFA would provide a credit for unsold artwork to be applied against the recourse portion of the note. The letter stated that SMFA would never seek any further monies from investors. The letter destroyed the at risk requirement of § 465 and thereby made the planned deductions illegal.

Defendant William Kelley, owner of Financial Consultants of Indiana, Inc., was one of several promoters of the SMFA tax shelter in Indiana. Other promoters included: Raymond Dudek, an associate in Kelley's firm; and Alfred Brown, Steven Goldstein, and Alvin Katzman, partners in an Indiana law firm ("Brown's law firm"). All of these promoters maintained their offices in the same building and worked together in selling the tax shelters.

In 1979, Kelley purchased an SMFA tax shelter for himself and sold the shelter to at least six of his clients. All of the closings took place in the conference room of Brown's law firm. Present at the closings were the investor, a representative of SMFA named Alan Bernstein, at least one

representative of Brown's law firm, and either Kelley or Dudek. Brown testified that at the closings the investors were told that they should keep the side letter agreement "in a safe place" and avoid showing it to the IRS if they were audited, because otherwise "the tax shelter itself might be in question."

As a result of this tax shelter scheme, Alfred Brown, Steven Goldstein, and Alan Bernstein each pled guilty to one count of 26 U.S.C. § 7206(2), aiding and assisting in the filing of a false tax return. Kelley went to trial on nine counts: one count of 26 U.S.C. § 7206(1), based on his 1981 individual tax return, and eight counts of 26 U.S.C. § 7206(2), based on the 1980 and/or 1981 tax returns of the six clients to whom he had sold the tax shelters. He was convicted on all counts.

## II.

On appeal, Kelley first argues that the district court erred in refusing to give his tendered instruction on good faith reliance on advice of counsel. Kelley had testified at trial that attorney Alfred Brown introduced the SMFA tax shelter to him, recommended that it was a "superior" investment, and never told Kelley that the side letter agreement violated the at risk requirement of § 465. Kelley's proposed instruction read as follows:

If you find that attorney Alfred Brown was fully informed of all relevant facts and advised William J. Kelley that the Stephen Mandarano Fine Arts tax deductions were lawful and proper, and if you find that William J. Kelley relied on that advice, then you may use that as a factor in assessing William J. Kelley's good faith or lack of intent to violate the tax laws.

Kelley claims that the court's refusal to give the instruction denied him the right to have his defense theory presented to the jury.

■ Good faith reliance on the advice of counsel is a valid defense to the charge of willfully filing, or willfully assisting others in filing, a false tax return. *United States v. Whyte,* 699 F.2d 375, 379 (7th Cir.1983).

Further, it is well settled that a "defendant in a criminal case is entitled to have the jury consider any theory of the defense which is supported by law and which has some foundation in the evidence, however tenuous." *United States v. Grimes,* 413 F.2d 1376, 1378 (7th Cir.1969); *see also United States v. Boucher,* 796 F.2d 972 (7th Cir.1986); *United States v. Walsh,* 627 F.2d 88, 93 (7th Cir.1980); *United States v. Creamer,* 555 F.2d 612, 616 (7th Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed. 2d 93 (1977). This is not to say, however, that the defendant is entitled to a particular instruction. Rather, the defendant is entitled only to have his *theory,* if supported by the evidence, considered by the jury. *See United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987); *Boucher,* 796 F.2d at 976. The questions on appeal, then, are whether the evidence supported Kelley's theory of good faith reliance on advice of counsel and, if so, whether the court's instructions, viewed as a whole, encompassed that theory.

■ Whether there was a foundation in the evidence to support the defense theory of good faith reliance is questionable. The testimony of Brown and Kelley at trial showed only that Brown had served as Kelley's attorney on other matters prior to the SMFA investment, that Brown reviewed tax shelter investments as part of his law practice, that Brown introduced Kelley to the SMFA investment, that Brown told Kelley that the SMFA investment was superior, in the sense of more profitable, than another investment they had discussed, and that Brown did not tell Kelley that the side letter agreement violated the at risk requirement of § 465. To place this testimony in perspective, we also note the following. Kelley testified that he did not retain Brown for legal advice on the SMFA investment. Brown and Kelley each travelled separately to New Jersey to view the SMFA artwork and facilities and to discuss with Mandarano and Bernstein the investment. Bernstein testified that he and Mandarano went over all aspects of the program with Kelley, including the offering memorandum and the side letter agree-

ment. Brown testified that at various closings at which Kelley and he were both present, Bernstein would tell the investor that the side letter agreement should be kept secret from the IRS. He testified that he did not tell Kelley about his "concern" about the impact of the side letter agreement on the propriety of the tax deductions because it was apparent at the closings that Kelley was already familiar with it. Brown testified that at some of the closings Kelley himself told the client to keep the side letter agreement "in a safe place" and not show it to the IRS.

Even assuming that the evidence supported the defense theory of good faith reliance, however, we find that the instructions, viewed as a whole, adequately encompassed that theory. Willfulness is an element of both 26 U.S.C. § 7206(1) and (2). The court's instructions required the jury to find that Kelley acted knowingly and willfully. In defining "knowingly," the court required the jury to find that the defendant did not act through ignorance, mistake, or accident. The court defined "willfully" as "voluntarily and intentionally with the purpose of avoiding a known legal duty." In *United States v. Pomponio*, 429 U.S. 10, 97 S.Ct. 22, 50 L.Ed.2d 12 (1976), the Supreme Court held that the term "willful" in § 7206 means "a voluntary, intentional violation of a known legal duty," and that where a trial court so instructs the jury, an "additional instruction on good faith [is] unnecessary." *Id.* at 12–13, 97 S.Ct. at 24. Similarly, in *United States v. Moore*, 627 F.2d 830 (7th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), a case involving failure to file income tax returns in violation of § 7203, we stated that a "jury's conclusion that defendant acted willfully would necessarily negate any possibility of 'good faith' in failing to file." *Id.* at 833. Thus, the court's instructions on willful-

ness necessarily encompassed Kelley's theory of good faith reliance on counsel's advice.[1]

### III.

■ Kelley next argues that the district court erroneously admitted into evidence statements made by Stephen Mandarano to an undercover IRS agent. The agent testified that in December 1982 he posed as a financial consultant and attempted to obtain information on tax shelter investments from Mandarano. The agent testified that Mandarano explained the SMFA investment to him, and told the agent that the side letter agreement was to be kept secret and never shown to the IRS. Kelley objected at trial to the admission of this testimony, asserting that Mandarano's statements were hearsay. The district court admitted the testimony, under Fed.R.Evid. 801(d)(2)(E), as statements of a co-conspirator. The district court made the requisite findings under *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978), that it was more probable than not that: 1) the declarant and the defendant were members of a conspiracy; 2) when the hearsay statement was made; and 3) that the statement was in furtherance of the conspiracy. Kelley challenges the district court's findings on all three points.[2]

As to the first requirement, that the declarant and the defendant were members of a conspiracy, we initially note that Rule 801(d)(2)(E) applies not only to conspiracies but also to joint ventures, and that a charge of criminal conspiracy is not required to invoke the evidentiary rule. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir.1983); *United State v. Regilio*, 669 F.2d 1169, 1174 n. 4 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). The district court stated that its use of the term "conspiracy"

---

1. In addition, Kelley's attorney argued in closing that Kelley had relied in good faith on Brown's advice regarding the tax consequences of the investment. Thus, there is no doubt that Kelley's defense theory was presented to the jury.

2. Kelley alternatively argues that the district court might have erroneously admitted the statements as showing a method of operation. Our reading of the record shows that, although the court at one point mentioned method of operation, the court clearly admitted the statements under Fed.R.Evid. 801(d)(2)(E). *See* Trial Transcript, Vol. IV, pp. 147–48.

connoted a joint venture. With that noted, we find that there was sufficient evidence to support the district court's finding that Mandarano and Kelley were members of a conspiracy/joint venture. The evidence showed that Mandarano owned SMFA; that Kelley was one of several promoters of the SMFA investment in Indiana; that Kelley travelled to New Jersey and met with Mandarano to discuss the tax shelter before Kelley started promoting it; that Alan Bernstein, an employee of Mandarano, participated in the closings on the sales to Kelley's clients; that Kelley was aware of the side letter agreement; and that, according to Alfred Brown, at some of the meetings and/or closings Kelley told the customer that the letter was to be kept secret from the IRS.

As to the second requirement, that Mandarano's statements were made at the time the joint venture existed, Kelley argues that the evidence showed only that Kelley sold the investments to his clients in 1979, and that there was no evidence that the joint venture continued through December 1982. We disagree. Kelley's clients were filing tax returns each year after 1979, claiming deductions for the SMFA shelters that they had purchased. That was the whole point of the investment. The conspiracy did not end on the day of Kelley's last closing of an SMFA shelter in 1979. Mandarano was still promoting the shelter in 1982, his statements to the undercover agent were to induce him to become an investor and/or promoter of the shelter, Kelley's clients were still claiming deductions, and presumably all members of the conspiracy were still keeping the side letter agreements "in a safe place" in order to avoid jeopardizing the scheme. *See United States v. Diez*, 515 F.2d 892 (5th Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976) (conspiracy to evade paying income tax did not terminate when returns were filed since tax evasion scheme required continued concealment of underlying transactions).

As to the third requirement, that the statements were made in furtherance of the conspiracy, Kelley makes a meritless argument. He asserts that because it was allegedly imperative that his clients keep the side letter agreement secret, Mandarano's telling more persons—namely, the undercover agent—about the side letter agreement could only have hurt, not furthered, the conspiracy.

In sum, the district court properly admitted Stephen Mandarano's statements into evidence.

### IV.

■ Kelley's third argument concerns counts 1 through 8 of the indictment which charged that he assisted others in the filing of false tax returns, in violation of 26 U.S.C. § 7206(2). These counts were based on the 1980 and/or 1981 returns of the six clients to whom Kelley sold the investments. Kelley claims that these counts were barred by the statute of limitations.

The statute of limitations for violations of 26 U.S.C. § 7206(2) is six years, as set out in 26 U.S.C. § 6531(3). The parties are in agreement that an offense under § 7206(2) is committed, and thus the limitation period begins to run, "at the time the return is filed." *United States v. Habig*, 390 U.S. 222, 223, 88 S.Ct. 926, 927, 19 L.Ed.2d 1055 (1968). Kelley argues that the limitation period began to run in 1980 when his clients filed their 1979 tax returns and that the period ended no later than six years from the last of those filings, namely October 15, 1986. He asserts that the charges under § 7206(2), filed on May 27, 1987, were time-barred and that the district court erred in failing to dismiss those charges.

The Government maintains that although the limitation period had elapsed with respect to the offenses committed by the filings of the 1979 tax returns, subsequent offenses were committed when Kelley's clients filed their 1980 and 1981 returns in, respectively, 1981 and 1982. The Government asserts that it is not limited to prosecuting Kelley for only the first filings of his clients' 1979 returns in 1980 but that it can, and timely did, bring charges based on Kelley's clients' subsequent 1980 and 1981 returns that were filed in 1981 and 1982.

Kelley responds that under that logic, a defendant could conceivably be prosecuted 13 years after the acts constituting a violation of § 7206(2). For example, had Kelley's clients continued to claim the illegal deductions for seven years, and an offense occurs with the filing of each successive tax return, the six-year statute of limitations added to the seventh year's offense would total 13 years from the time Kelley had advised his clients about the SMFA investment.

It appears that the issue is one of first impression. The parties and the court have found no cases on point. Kelley relies solely on the general proposition that statutes of limitations should be liberally construed in favor of repose. This proposition is based on two rationales: 1) "to bar prosecutions on aged and untrustworthy evidence"; and 2) "to cut off prosecution for crimes a reasonable time after completion." 22 C.J.S. *Criminal Law* § 223. Kelley also points to the fact that the general limitation period for violations of the internal revenue laws is three years and that only certain offenses, including willfully assisting in the filing of false tax returns, are given a six-year limitation period.

Neither the two rationales cited nor the fact that the limitation period for violations of § 7206(2) is six rather than three years persuades us that the charges against Kelley were time-barred. There is no problem here of aged and untrustworthy evidence nor of unreasonable intervals between the time of the offense and the time of prosecution. An offense occurred each time Kelley's clients, acting pursuant to his advice, filed a tax return claiming the illegal deductions. As previously stated, the whole point of the tax shelter was for investors to claim depreciation deductions for seven years. Kelley's clients were in the process of doing just that, until the government stepped in. At no point did Kelley retract his advice and tell his clients that they should stop claiming the illegal deductions.

The government brought charges against Kelley based on the 1980 and 1981 returns of his clients within six years of the filing

of those returns. Thus, the charges were timely filed.

## V.

Kelley asserts that there was insufficient evidence to support the convictions. He appropriately states this court's standard of review as "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis omitted). Kelley claims that there was insufficient evidence on the element of willfulness, reasoning that, although there was sufficient evidence to show that Kelley knew that the side letter agreement took away the investor's obligation to pay back the "recourse" note, the evidence did not go so far as to show that he knew that the side letter agreement made the deductions illegal under the § 465 at risk requirement. We disagree.

Much of the evidence against Kelley has already been recited in the course of this opinion. We reiterate that testimony was introduced at trial that at some of the closings Kelley himself told the investors to keep the side letter agreement secret from the IRS. In addition, we point out that one of Kelley's clients, Dr. Strickland, testified that Kelley explained to him the difference between recourse and non-recourse notes and the change in the tax laws in 1979 that required investors to be at risk. Strickland further testified that Kelley explained to him "that a certain proportion of the investment had to be at risk in order to qualify for tax savings, that the recourse portion of the note represented that portion of the investment that would be at risk, but that, in fact, it was not at risk." The evidence was sufficient for a rational trier of fact to find the element of willfulness beyond a reasonable doubt.

## VI.

Over objection at trial, the Government introduced an April 26, 1981 newspaper advertisement which invited attendance

at a three-day financial planning seminar conducted by Kelley's corporation, Financial Consultants of Indiana. The advertisement stated that the seminar would be "with William J. Kelley, Raymond J. Dudek, James Brocke" and that topics would include "How the NEW TAX LAWS can help you avoid taxes legally NOW," "How to get tax-free income," "TAX SAVINGS TECHNIQUES," "How to build A TAX–FREE INCOME," and "Turning your tax liabilities into capital assets." The advertisement noted "30 Years of Financial Planning Experience." Kelley claims that the advertisement was not relevant and that any relevancy was outweighed by its prejudicial effect, citing Fed.R.Evid. 401, 403. Kelley argues that simply because the advertisement stated that the seminar would be "with" William J. Kelley, the advertisement was not relevant to whether Kelley had knowledge of the specific at risk requirement of § 465. We disagree.

At trial, Kelley maintained that he did not act willfully or knowingly. The advertisement was clearly relevant as evidence to rebut his claim of ignorance. Kelley was president of Financial Consultants, actively participated in promoting tax shelters, and advertised his company as having 30 years' experience. The advertisement was placed around the time that Kelley's clients' 1980 tax returns would become due —tax returns that contained illegal deductions taken on the SMFA investment sold to them by Kelley with the advice to keep the side letter agreement "in a safe place." The advertisement shed probative light on the element of willfulness. Moreover, the Government introduced the advertisement only after Kelley specifically testified that his company did not, and never had, provided tax advice. The advertisement is clearly relevant on the issue of Kelley's credibility in denying that his company ever gave tax advice.

As to its prejudicial effect, we review the district court's determination under an abuse of discretion standard. *United States v. Laughlin,* 772 F.2d 1382, 1393 (7th Cir.1985). The district court did not abuse its discretion in determining that the probative value of the advertisement was not outweighed by its prejudicial effect.

## VII.

Kelley's final contention is that the district court erred in rejecting his tendered instruction on first amendment protection of advocacy. The instruction read as follows:

"William J. Kelley is afforded First Amendment protection from prosecution for mere advocacy of a tax shelter program. The First Amendment defense is afforded a defendant who did not actively perform all the organizational and managerial tasks necessary to create and operate the tax shelter.

If you find that William J. Kelley was not closely involved in the creation and operation of the "Stephen Mandarano Fine Arts" tax shelter program, the First Amendment protects him from criminal sanction."

Kelley relies on a line of Ninth Circuit cases to support the giving of this instruction. In *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984), the court held that mere advocacy of a tax shelter program is protected by the first amendment. In that case, the defendants formed a membership organization (the "ALA") that provided advice to members about how to set up foreign trust organizations ("FTO's") as tax shelters. The ALA ran seminars where members were instructed on how to create FTO's. The seminar did not include advice or assistance in tax return preparation, and it was up to each member as to whether he would carry through and create an FTO. Moreover, the legality of an FTO shelter was not settled at the time of the seminars.

In two subsequent cases, the Ninth Circuit has narrowed the *Dahlstrom* holding to find that where a defendant's actions constitute more than mere advocacy, the defendant is not protected by the first amendment. *See United States v. Schulman,* 817 F.2d 1355 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 362, 97 L.Ed.2d 803 (1987) (defendant created limited part-

nership and sold partnership interests representing that investment would be deductible; no first amendment protection); *United States v. Solomon*, 825 F.2d 1292 (9th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 782, 98 L.Ed.2d 868 (1988) (defendants established limited partnerships to purchase patents at inflated prices and sold partnership shares to investors representing that portion of partnership losses would be deductible; no first amendment protection). In each of these cases, the court noted that the defendants were involved in the creation, organization, and operation of the tax shelters (limited partnerships) at issue. Kelley argues, that because he merely promoted the SMFA shelter but was not involved in creating or operating SMFA, his case is more like *Dahlstrom* than *Schulman* and *Solomon*. He urges us to follow *Dahlstrom* and, further, to find that the evidence supported a first amendment protection of advocacy instruction.

We initially note that we are not bound by Ninth Circuit precedent. Nevertheless, without deciding whether a protection of advocacy instruction would ever be appropriate in a case brought under § 7206, we find that unlike *Dahlstrom*, Kelley did more than merely advocate a tax shelter at a seminar. The evidence showed that he sold the shelter to his clients, advised his clients about the "recourse" portion of the notes, told his clients to keep the side letter agreement secret from the IRS, attended and participated in the closings, and received a commission for each sale. The district court properly rejected the first amendment protection of advocacy instruction.

## VIII.

For the reasons stated herein, the judgment of the district court is AFFIRMED.